UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-60071-Civ-MARRA
        (04-60232-Cr-MARRA)
MAGISTRATE JUDGE P. A. WHITE

HAROLD JULES,                    :

            Movant,             :

v.                               :        **REPORT OF MAGISTRATE JUDGE**
                                          **FOLLOWING EVIDENTIARY HEARING**
UNITED STATES OF AMERICA  :

            Respondent.         :
_____

Introduction

    This matter is before the Court on the movant's motion to
vacate pursuant to 28 U.S.C. §2255, attacking his convictions and
sentences for conspiracy to distribute five grams or more of crack
cocaine and distribution of five grams or more of crack cocaine,
entered following a jury trial in criminal case no. 04-Cr-60232-
Marra.

    This Court has reviewed the motion (Cv-DE#1) with supporting
memorandum and affidavits (Cv-DE#2), the government's responses
with exhibits (Cv-DE#s7,14), the movant's replies (Cv-DE#s10,17),
the PSI, and the underlying criminal file.

    In his form motion (Cv-DE#1), the movant raises the following
four claims:

        1.    He was denied effective assistance of counsel,
              where his lawyer misadvised him concerning the
              benefits of pleading guilty versus proceeding to
              trial, and its impact on his applicable sentencing
              guidelines, including determination of relevant
              conduct and acceptance of responsibility. (Cv-

DE#1:5; Cv-DE#2:24).

2.   He was denied effective assistance of counsel, where his lawyer failed to prepare and/or otherwise call defense witnesses to testify at trial. (Cv-DE#1:6; Cv-DE#2:27).

3.   He was denied effective assistance of counsel, where his lawyer failed to advise the court that the movant was in possession of the equivalent of powder cocaine, not crack cocaine, in order to ensure that his guideline sentence was properly computed. (Cv-DE#1:8; Cv-DE#31).

4.   The cumulative effects of counsel's errors warrant vacatur of the convictions and sentences. (Cv-DE#1:9; Cv-DE#34).

After review of the record, it became apparent that an evidentiary hearing was necessary at least with regard to claim one, as listed above. Arthur Wallace, Esquire was appointed to represent the movant, and an evidentiary hearing held on September 21, 2010.

<u>Procedural History</u>

In order to place the procedural posture of this case in context, a detailed procedural history of the underlying criminal case is required. On February 22, 2005, a Superseding Indictment was returned charging the movant and his coconspirators, Steven Eugene and Terrence Lee with conspiracy and drug related offenses. (Cr-DE#34). Specifically, the movant was charged with conspiracy to distribute five grams or more of crack cocaine, in violation of 21 U.S.C. §841(a)(1) and §841(b)(1)(B), and 21 U.S.C. §846 (Count 1), two counts of possession with intent to distribute five grams or more of crack cocaine, in violation of 21 U.S.C. §841(a)(1) and §841(b)(1)(B), and 18 U.S.C. §2 (Counts 2,6), and illegal reentry

following deportation, in violation of 18 U.S.C. §1326. (Cr-DE#34).
Count 8 was severed from the remainder of the Superseding
Indictment for purposes of trial. (Cr-DE#168).

Prior to trial, the movant filed a pretrial motion to suppress
evidence seized from his car (Cr-DE#58), as well as, a motion for
sanctions and to suppress post-arrest statements[1] (Cr-DE#73). The
trial court denied the motion for sanctions, and proceeded on the
movant's motion to suppress evidence. (Cr-DE#159). At the
conclusion of the evidence, the court found that the movant had
been advised of his <u>Miranda</u> rights, and that the movant had also
invoked his right to remain silent by shaking his head in response
to the agent's questions. (Cr-DE#153:635). However, the court found
that the movant's initial statements to an agent constituted
spontaneous statements and were thus admissible, but any statements
made by the movant after the agent began questioning the movant
were to be suppressed. (Cr-DE#153:636-37).

The movant then proceeded to trial, where he was found guilty
as charged, following a jury verdict. (Cr-DE#109). Thereafter, the
government sought dismissal of Count 8, which was granted by the
trial court. (Cr-DE#168).

Before sentencing, a PSI was prepared, which reveals as
follows. The counts of conviction were grouped together pursuant to
U.S.S.G. §3D1.2(d) because the offense level was based largely on
the total harm or loss, the quantity of the drugs, or some other
measure of aggregate harm. (PSI ¶26). The initial base offense

---

[1]According to the movant, the government failed to disclose that such a
statement existed until the third supplemental response to discovery, filed one
week prior to trial. (Cr-DE#73). The movant claimed the untimely disclosure
severely prejudiced movant and, therefore, the statements should be suppressed.

level for violation of §841 and §846, pursuant U.S.S.G. §2D1.1(a)(3), was set at a level 28 because the offenses involved conspiracy to distribute and distribution of at least 20 grams, but less than 35 grams of cocaine base. (PSI ¶27). Two levels were added due to the movant's status as an organizer, leader, manager, or supervisor, resulting in an adjusted offense level 30. (PSI ¶¶30-32).

However, that base offense level was irrelevant, as the probation officer determined that the movant qualified for an enhanced sentence as a career offender pursuant to U.S.S.G. §4B1.1(a). (PSI ¶33). In so finding, it was noted that the movant was at least 18 years old at the time of the instant offenses, the instant offenses were controlled substance offenses, and the movant had at least two prior felony convictions involving controlled substances. (PSI ¶33). Consequently, the movant's offense level was increased to a level 37.(PSI ¶35).

The probation officer next determined that the movant had a total of 15 criminal history points, resulting in a criminal history category VI. (PSI ¶59). However, regardless of the amount of points assessed, because the movant qualified as a career offender, his criminal history category remained a category VI pursuant to U.S.S.G. §4B1.1. (PSI ¶59). Based on a total offense level 37 and a criminal history category VI, the movant's guideline range was set at 360 to life in prison. (PSI ¶94). Statutorily, the movant faced a minimum of 10 years to a maximum of life imprisonment as to each of the offenses, pursuant to 21 U.S.C. §841(b)(1)(B)(iii) and §851. (PSI ¶93).

Thereafter, the movant appeared for sentencing, at which time the court sentenced the movant to the bottom of the guideline

range, to a total term of 360 months in prison, followed by 8 years of supervised release. (Cr-DE#s,128,161). The movant appealed, raising multiple claims,[2] challenging: (1) the trial court's admission into evidence of audiotapes, telephone records, and the movant's prior criminal conduct; (2) the denial of his motion to suppress post-arrest statements; and (3) the denial of his motion for mistrial based on prosecutorial misconduct during closing argument.

On August 9, 2007, the Eleventh Circuit, in a written, but unpublished opinion, affirmed the movant's convictions and sentences. United States v. Jules, 244 Fed.Appx. 964 (11th Cir. 2007); (Cr-DE#180). Review of the Eleventh Circuit's on-line docket on Pacer, reveals that rehearing was denied on October 11, 2007.[3] Thus, the judgment of conviction in the underlying criminal case became final, for purposes of the federal one year limitations period under the AEDPA, at the latest on January 11, 2008, when time expired for seeking certiorari review ninety days following the conclusion of the movant's direct appeal.[4] His motion was due to be filed in this court within one year, or no later than January 11, 2009. See Griffith v. Kentucky, 479 U.S. 314, 321, n.6 (1986);

--------

[2]The claims are gleaned from the movant's initial brief on appeal, located on Westlaw, a legal research database, at United States v. Jules, 2006 WL 4578513 (11th Cir. 2006), and from the Eleventh's Circuit written, but unpublished opinion affirming the movant's convictions and sentences, United States v. Jules, 244 Fed.Appx. 964 (11th Cir. 2007); (Cr-DE#180).

[3]See http://pacer.ca11.uscourts.gov/CHMSDKTP.FWX.

[4]The Supreme Court has stated that a conviction is final when a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied. Griffith v. Kentucky, 479 U.S. 314, 321, n.6 (1986); accord, United States v. Kaufmann, 282 F.3d 1336 (11th Cir. 2002). Once a judgment is entered by a United States court of appeals, a petition for writ of certiorari must be filed within 90 days of the date of entry. The 90 day time period runs from the date of entry of the judgment rather than the issuance of a mandate. Sup.Ct.R. 13; see also, Close v. United States, 336 F.3d 1283 (11th Cir. 2003).

accord, <u>United States v. Kaufmann</u>, 282 F.3d 1336 (11th Cir. 2002). This motion to vacate was timely filed less than one year later on January 6, 2009.[5]  (Cv-DE#1).

Facts Adduced at Trial

The evidence adduced at trial reveals as follows. In early July 2004, the government's confidential informant ("CI") Jordan Mills, was present when her friends, Jen and Kim, who were crack addicts, purchased user amounts of crack cocaine from the movant. (Cr-DE#155:1119-1120). A week later, the movant introduced Mills to Eugene at a residence located at 2849 S.W. 4th Court in Ft. Lauderdale, Florida ("the residence"). (Cr-DE#155:1124-25). During the ensuing weeks, Mills made numerous purchases of powder and crack cocaine from both the movant and his codefendant Eugene, sometimes five to six times a day, a couple of days a week. (Cr-DE#155:1123,1127).

After noticing conduct consistent with narcotics activities at the residence, Detective John Jensen, with the Ft. Lauderdale Police Department, began surveillance in July 2004. (Cr-DE#153:718-19). On July 28th, 2004, Detective Jensen stopped a vehicle driven by CI Mills as it left the residence, and found two small pieces of crack cocaine in a cigarette package within the car. (Cr-DE#153:722). At that time, Mills was accompanied by Barry Capell. (Cr-DE#153:723). Thereafter, Mills cooperated in the investigation of narcotics activities at the residence. (Cr-DE#153:724).

---

[5] <u>See</u>: <u>Adams v. U.S.</u>, 173 F.3d 1339 (11 Cir. 1999) (prisoner's pleading is deemed filed when executed and delivered to prison authorities for mailing). Although not dated, it was received by the Clerk on September 30, 2008, therefore, that will be the date used for calculating the timeliness of the instant case.

6

During the following week, Mills made controlled phone and controlled purchases of crack cocaine from the residence. (Cr-DE#153:727; Cr-DE#155:1147). Specifically, she made three controlled purchases of crack cocaine from either the movant or Eugene, as follows: (1) 8.7 grams from the movant on July 28, 2004; (2) 3.8 grams from Eugene on July 30, 2004, and (3) 6.5 grams from Eugene on August 4, 2004. (Cr-DE#155:1156-82; Cr-DE#157:1855-1861). The day after her last controlled purchase, both the movant and Eugene advised Mills that she was no longer welcome at the residence because they had heard that she was working with the police. (Cr-DE#155:1183-84).

In the ensuing month, the police department also set up an additional three controlled crack purchases from the movant and/or Eugene, during which "Vito," another CI, set up the transactions. Specifically, during one such transaction, undercover Detective Keith Rohloff, wearing a transmitting device, made a purchase of $500 worth of crack cocaine from Eugene at the residence. (Cr-DE#153:781; Cr-DE#156:1392). Vito took the undercover detective to the residence, at which time Eugene, suspicious of the agent, attempted to force the agent to put one of the rocks into his mouth, but the agent refused. (Cr-DE#156:1400-1410; Cr-DE#157:1862). Regardless, after receiving assurances from Vito, Eugene sold the agent 5.7 grams of crack cocaine. (Cr-DE#156:1410; Cr-DE#157:1862).

On September 1, 2004, Detective Jensen set up a buy with the movant, again using Vito to introduce the detective to the movant. After numerous conversations, the movant agreed to meet Vito and the undercover agent at a Wendy's in Ft. Lauderdale. (Cr-DE#154:869,894). At the designated location, Detective Jensen, while wearing a wire, approached the movant's vehicle, handed him

7

$500.00 in exchange for a quarter cookie of crack cocaine. (Cr-DE#154:901,913). Detective Jensen and Vito then walked away from the movant's vehicle, and gave a signal to effectuate the movant's arrest. (Cr-DE#154:902). Within seconds, the movant was arrested. (Cr-DE#154:913-14).

Meanwhile, more than an hour later, a joint DEA and Ft. Lauderdale Police Department take-down team executed a search warrant on the residence. (Cr-DE#156:1353-1356). In the hour between the movant's arrest and execution of the warrant, Eugene called the movant twice and both times reached voice-mail. (Cr-DE#158:2072-73). No drugs were found in the residence, but approximately $1,100 in cash was found in Eugene's bedroom. (Cr-DE#156:1375).

<u>Standard</u>

In this collateral proceeding, the movant raises multiple claims challenging counsel's effectiveness, that are subject to the two-part test enunciated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1994), which is not a favorable standard. <u>See</u> <u>Massaro v. United States</u>, 538 U.S. 500, 505 (2003). To prevail on a claim of ineffective assistance, a petitioner must demonstrate both that (1) counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defendant. <u>Chandler v. United States</u>, 218 F.3d 1305, 1312-13 (11th Cir. 2000)(*en banc*), <u>cert</u>. <u>denied</u>, 531 U.S. 1204 (2001); <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). The standard is the same for claims of ineffective assistance on appeal. <u>Matire v. Wainwright</u>, 811 F.2d 1430, 1435 (11 Cir. 1987). Moreover, a habeas court's review of a claim under the <u>Strickland</u> standard is "doubly deferential." <u>Knowles v. Mirzayance</u>, ___ U.S.

__, 129 S.Ct. 1411, 1418 (2009).

In deciding whether counsel's performance was deficient, judicial scrutiny is "highly deferential" and requires us to "'indulge [the] strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment.'" Id. at 1314 (quoting Strickland v. Washington, 466 U.S. at 689-90; Chandler v. United States, 218 F.3d 1305 (11 Cir. 2000)(en banc), cert. denied, 531 U.S. 1204 (2001). The court's role in reviewing ineffective assistance of counsel claims is not to "grade a lawyer's performance; instead, [the court] determine[s] only whether a lawyer's performance was within "the wide range of professionally competent assistance." Van Poyck v. Florida Dept. of Corrections, 290 F.3d 1318, 1322 (11 Cir.), cert. denied, 537 U.S. 812 (2002), quoting, Strickland v. Washington, 466 U.S. 668, 690. Review of counsel's conduct is to be highly deferential. Spaziano v. Singletary, 36 F.3d 1028, 1039 (11 Cir. 1994), and second-guessing of an attorney's performance is not permitted. White v. Singletary, 972 F.2d 1218, 1220 (11 Cir. 1992)("Courts should at the start presume effectiveness and should always avoid second-guessing with the benefit of hindsight."); Atkins v. Singletary, 965 F.2d 952, 958 (11 Cir. 1992). A claim of ineffective assistance is a mixed question of law and fact. Strickland, 466 U.S. at 698.

The Eleventh Circuit will not "second-guess counsel's strategy." Chandler, 218 F.3d at 1314, n.14. Strategic choices, even those "made after less than complete investigation," are evaluated for their reasonableness and "counsel's reliance on particular lines of defense to the exclusion of others--whether or not he investigated those other defenses--is a matter of strategy and is not ineffective unless the petitioner can prove the chosen

course, in itself, was unreasonable." <u>Chandler</u>, 218 F.3d at 1318 (<u>quoting</u> <u>Strickland</u>, 466 U.S. at 690-91).

The courts "are not interested in grading lawyers' performances;" but rather, "are interested in whether the adversarial process at trial...worked adequately." <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir. 1994)(quotation marks omitted). To be unreasonable, the performance must be such that "no competent counsel would have taken the action that [the petitioner's] counsel did take." <u>Grayson v. Thompson</u>, 257 F.3d 1194, 1216 (11th Cir. 2001)(emphasis omitted). In other words, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." <u>Rogers v. Zant</u>, 13 F.3d at 386.

Under the second prong of the test set forth in <u>Strickland</u>, the petitioner can be said to have been prejudiced by counsel's performance only if there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694. Rather, the petitioner must demonstrate that "there is a reasonable probability that, absent [counsel's] errors, the jury would have had a reasonable doubt regarding [his] guilt." <u>Blackburn v. Foltz</u>, 828 F.2d 1177, 1186 (6th Circ. 1987), <u>cert. den'd</u>, 485 U.S. 970 (1988), <u>see also</u>, <u>Montgomery v. Petersen</u>, 846 F.2d 407, 416 (7th Cir. 1988).

However, it is well settled that tactical or strategic choices by counsel cannot support a collateral claim of ineffective assistance. <u>United States v. Costa</u>, 691 F.2d 1358 (11 Cir. 1982);

<u>Coco v. United States</u>, 569 F.2d 367 (5 Cir. 1978). Even if such a decision in retrospect appears incorrect, it can constitute ineffective assistance only "if it was so patently unreasonable that no attorney would have chosen it," <u>Adams v. Wainwright</u>, 709 F.2d 1443, 1445 (11 Cir.), <u>cert. denied</u>, 464 U.S. 1663 (1984), or if the petitioner can demonstrate a "reasonable probability that the verdict [otherwise] would have been different." <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 375 (1986).

Decisions whether to call a particular witness or cross-examine certain witnesses are generally questions of trial strategy. <u>See</u> <u>United States v. Costa</u>, 691 F.2d 1358 (11 Cir. 1982). However, where counsel failed to investigate and interview promising witnesses, and therefore "ha[s] no reason to believe they would not be valuable in securing [defendant's] release," counsel's inaction constitutes negligence, not trial strategy. <u>Workman v. Tate</u>, 957 F.2d 1339, 1345 (6th Cir. 1992)(<u>quoting</u> <u>United States ex rel. Cosey v. Wolff</u>, 727 F.2d 656, 658 n.3 (7th Cir. 1984)). Nevertheless, strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. <u>Strickland v. Washington</u>, 466 U.S. at 690-91.

As will be demonstrated in more detail <i>infra</i>, the movant is not entitled to vacatur on any of the claims presented. When viewing the evidence in this case in its entirety, the alleged errors raised in this collateral proceeding, neither individually nor cumulatively, infused the proceedings with unfairness as to deny the movant a fundamentally trial and due process of law. The movant therefore is not entitled to habeas corpus relief. <u>See</u> <u>Fuller v. Roe</u>, 182 F.3d 699, 704 (9 Cir. 1999)(holding in federal habeas corpus proceeding that where there is no single constitutional error existing, nothing can accumulate to the level

of a constitutional violation), <u>overruled on other grounds</u>, <u>Slack v. McDaniel</u>, 529 U.S. 473, 482 (2000). <u>See also</u> <u>United States v. Rivera</u>, 900 F.2d 1462, 1470 (10 Cir. 1990)(stating that "a cumulative-error analysis aggregates only actual errors to determine their cumulative effect."). Contrary to the movant's apparent assertions, the result of the proceedings were not fundamentally unfair or unreliable. <u>See</u> <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 369-70 (1993).

Evidentiary Hearing Claims

A. <u>Misadvice Regarding Pleading Guilty</u>

In **claim one,** the movant asserts that he was denied effective assistance of counsel, where his lawyer misadvised him concerning the benefits of pleading guilty versus proceeding to trial, and its impact on his applicable sentencing guidelines, including determination of relevant conduct and acceptance of responsibility. (Cv-DE#1:5; Cv-DE#2:24). The movant maintains that counsel never informed him of his sentencing exposure under the guidelines so that he could make an informed decision whether or not to proceed to trial. (<u>Id</u>.; Cv-DE#1:Movant's Affidavit). The claim was not conclusively refuted by the record, and warranted further evidentiary findings. At the evidentiary hearing, testimony was taken from the movant and his criminal defense counsel, Victor Rocha, Esquire, as to this issue.

The Sixth Amendment right to counsel includes the right to competent advice regarding the choice to accept a plea bargain or go to trial. <u>Turner v. Tennessee</u>, 664 F.Supp. 1113, 1120 (M.D. Tenn.), <u>aff'd</u>, 858 F.2d 1201 (6 Cir. 1988), <u>vacated on other grounds</u>, 492 U.S. 902 (1989), <u>reinstated</u>, 726 F.Supp. 1113 (M.D. Tenn. 1989), <u>aff'd</u>, 940 F.2d 1000 (1991), <u>cert.denied</u>, 502 U.S.

12

1050 (1992); <u>accord</u>, <u>Johnson v. Duckworth</u>, 793 F.2d 898, 900-02 (7 Cir.), <u>cert.denied</u>, 479 U.S. 937 (1986)(criminal defendant has right to effective assistance of counsel in deciding whether to accept or reject proposed plea agreement); <u>United State ex rel. Caruso v. Zelinsky</u>, 689 F.2d 435, 438 (3 Cir. 1982)(decision to reject plea agreement is critical stage at which right to effective assistance attaches); <u>Beckham v. Wainwright</u>, 639 F.2d 262, 267 (5 Cir. 1991)(incompetent advice to withdraw negotiated plea and proceed to trial violated defendant's Sixth Amendment right).

A lawyer is obligated to keep the client informed of important developments, including any plea agreement offered by the government. Counsel's failure to do so is ineffective assistance. <u>Diaz v. United States</u>, 930 F.2d 832, 834 (11 Cir. 1991), <u>citing</u>, <u>Johnson v. Duckworth</u>, <u>supra</u>; <u>see also</u>, <u>Pham v. United States</u>, 317 F.3d 178, 182-83 (2d Cir. 2003)(defense counsel's failure to inform defendant of government's "global plea offer" constituted ineffective assistance); <u>Jones v. Wood</u>, 114 F.3d 1002, 1012 (9th Cir. 1997)(failure to inform client of plea bargain may have risen to the level of ineffective assistance of counsel if petitioner had shown prejudice); <u>United States v. Rodriguez</u>, 929 F.2d 747, 752 (1st Cir. 1991)("Ordinarily, counsel's failure to inform client of plea agreement constitutes ineffective assistance of counsel."); <u>United States v. Zelinsky</u>, 689 F.2d 435, 438 (3rd Cir. 1982)("It would seem that, in the ordinary case, a failure of counsel to advise his client of a plea bargain would constitute a gross deviation from accepted professional standards.").

In reviewing ineffective assistance of counsel with respect to guilty pleas, the United States Supreme Court has applied the "objective standard of reasonableness" by considering whether counsel's representation was "within the range of competence

demanded of attorneys in criminal cases." <u>Hill v. Lockhart</u>, 474
U.S. 52, 56-57 (1985)(applying <u>Strickland</u> requirements to review
for ineffective assistance of counsel with respect to guilty pleas
(citations omitted)). With regard to the prejudice prong, the Court
held that the inquiry focused on "whether counsel's
constitutionally ineffective performance affected the outcome of
the plea process." <u>Hill</u>, 474 U.S. at 59. If it is found that
counsel failed to inform his client of the government's plea offer,
the remedy is for the District Court to ensure that the government
reinstates its original plea offer. <u>United States v. Baylock</u>, 29
F.3d 1458, 1468 (9 Cir. 1994).

However, as with other claims of ineffective assistance, a
defendant who claims that counsel performed ineffectively in
connection with a decision to reject a plea offer must demonstrate
that he suffered prejudice to prevail. <u>Turner v. Tennessee</u>, 664
F.Supp. 1113 (M.D. Tenn.), <u>aff'd</u>, 858 F.2d 1201 (6 Cir. 1988),
<u>vacated on other grounds</u>, 492 U.S. 902 (1989), <u>reinstated</u>, 726
F.Supp. 1113 (M.D. Tenn. 1989), <u>aff'd</u>, 940 F.2d 1000 (1991),
<u>cert.denied</u>, 502 U.S. 1050 (1992); <u>accord</u>, <u>Johnson v. Duckworth</u>,
793 F.2d 898, 900-02 (7 Cir.), <u>cert.denied</u>, 479 U.S. 937
(1986)(criminal defendant has right to effective assistance of
counsel in deciding whether to accept or reject proposed plea
agreement); <u>United State ex rel. Caruso v. Zelinsky</u>, 689 F.2d 435,
438 (3 Cir. 1982)(decision to reject plea agreement is critical
stage at which right to effective assistance attaches); <u>Beckham v.
Wainwright</u>, 639 F.2d 262, 267 (5 Cir. 1991)(incompetent advice to
withdraw negotiated plea and proceed to trial violated defendant's
Sixth Amendment right).

Prejudice is established under <u>Strickland</u> by showing "that
there is a reasonable possibility that, but for counsel's errors,

he would...have pleaded guilty and would [not] have insisted on going to trial." Coulter v. Herring, 60 F.3d 1499, 1504 (11th Cir. 1995), cert. den'd, ___ U.S. ___, 116 S.Ct. 934 (1996), quoting, Hill, 474 U.S. at 59. See also, United States v. Diaz, 930 F.2d 832, 834-35 (11th Cir. 1991)(where defendant claimed counsel ineffective in advising him not to take plea offer, defendant must provide some evidence which indicates that prior to his conviction, he expressed a desire to plead guilty and would have accepted plea offer); Toro v. Fairman, 940 F.2d 1065, 1068 (7th Cir. 1991), cert. den'd, 505 U.S. 1223 (1992).

However, a movant's "after the fact testimony concerning his desire to plead, without more, is insufficient to establish" that he was prejudiced by "counsel's alleged advice or inaction." Id.; see also, Cook v. United States, 189 Fed.Appx. 927, 931 (11th Cir. 2006)(unpublished opinion) (holding that movant's "after the fact" assertion--that but for counsel's erroneous advice regarding extent of charges against him, he would have pleaded guilty--was insufficient to show prejudice).

Attorney Victor Rocha, an experienced and seasoned criminal defense attorney, practicing in Florida for over twenty-six years, testified that he recalled being appointed to represent the movant in September 2004. Counsel testified that within a few days of his appointment, he met with the movant, who was pre-trial detained. Counsel was unequivocal that he never had any problem communicating with the movant, who was fluent in English. During that meeting, discussions were had regarding which strategy would be most effective in obtaining the movant's release on bond.

Counsel was also forthright in his testimony that he then had numerous meetings with the movant, some of which were lengthy,

during which he never felt the movant needed a Creole interpreter. To the contrary, counsel remembered that the movant on occasion would have with him case law he obtained from the prison library, and question counsel regarding complex, legal issues he had researched and how it could possibly affect his case. Counsel also recalled reviewing with the movant transcripts of tape recordings the government had provided in discovery.

According to counsel, from early on in the case, the movant was "gearing up" for trial, because he would not accept a plea unless his sentence exposure was no more than six years. During one meeting, counsel specifically remembered the movant mentioning that he had retained an "investigator" who assured him that none of the government's witnesses, to-wit, Vito, Jordan Mills, and Barry Capell, were going to be present to testify at trial. When counsel questioned the movant as to the identity and contact information for the investigator, the movant was evasive, and told him that at the appropriate time, he would provide further information to counsel. At that point, counsel explained that even if the subject witnesses did not show, the government agents could testify as to the drug sales, and they also had independent evidence, including the movant's recorded conversations, as well as, the drugs seized.

Attorney Rocha continuously maintained that he advised the movant on multiple occasions about his options on pleading guilty or proceeding to trial. In fact, counsel recalled that it was his recommendation that the movant plead guilty. Specifically, after receiving the pre-trial service report, counsel had a meeting with the movant, at which time counsel advised the movant that he faced, if convicted, an enhanced sentence as a career offender. Counsel explained to the movant that if he pled guilty, and received a three level reduction in his guideline range for acceptance of

responsibility, his guideline sentence exposure would be approximately 22 years in prison. He also advised the movant that his relevant conduct would have no import on his federal guideline range because of his prior convictions which formed the basis for his status as a career offender. Counsel also cautioned the movant that his exposure, if convicted at trial, was much more severe, as he would face over 30 years in prison.

Counsel testified that in light of the movant's sentence exposure, he attempted to negotiate a plea with the government. During a meeting with the government, counsel testified that the government was not amenable to extending a plea offer, other than to permit the movant to plead to the indictment. In fact, the government was steadfast in its position that it intended to file an 851 enhancement, irrespective of whether or not the movant pleaded guilty. Counsel again met with the movant and relayed the government's position. At that meeting, counsel again went over the movant's sentencing exposure and the ramifications of an 851 enhancement, reminding the movant that if convicted at trial, he was facing over 30 years, rather than approximately 22 years if he pled guilty. More specifically, counsel made clear to the movant that the 851 filing would increase the movant's maximum exposure to life in prison, and that his minimum exposure, regardless of whether he pled guilty or proceeded to trial, would also be affected.

Counsel also testified that after he explained the foregoing, the movant became visibly agitated and verbally abusive, questioning counsel's abilities as a lawyer, because he could not secure a plea offer from the government which would expose the movant to no more than six years in prison. Counsel further testified that despite his recommendations to the contrary, the

17

movant nevertheless insisted on proceeding to trial.

The movant's testimony, however, was oftentimes inconsistent and equivocal. For example, the movant first testified that counsel did, in fact, explain the charges to him, but claims he had "trouble" understanding counsel, and suggested counsel hire an interpreter. Later, however, the movant testified that counsel never discussed any of the charges with him.

The movant also denied having any discussions with counsel regarding the guidelines or how much time he was facing. The movant further denied being advised by counsel that Count 2 carried a sentence of five to forty years in prison. In fact, the movant claims that counsel's lack of communication was the reason why he attempted to have counsel removed from his case. However, he then conceded that, during a discussion regarding his sentence exposure, counsel told him that "he didn't have to discuss all those intricacies with him."

Also, at first the movant testified counsel visited him at the Broward County Jail. Later, however, the movant testified that the only time he saw counsel was on the day of trial, which was when the movant first learned he was going to trial. According to the movant, counsel never discussed anything with him, and would only tell the movant that his only option was going to trial. He denied being advised of how the sentencing guidelines would impact his sentence. He again denied being advised of his sentence exposure if he went to trial versus his exposure if he pleaded guilty and received a reduction for his acceptance of responsibility. The movant, however, conceded being advised by counsel that the government did not have any plea offers because he had previously been deported and had re-entered the country unlawfully.

18

The movant also testified he became dissatisfied with counsel early on in his representation. According to the movant, he had trouble communicating with counsel. He also claims he provided counsel with the names and phone numbers of potential witnesses that should be called in his defense, but counsel refused to do so. The movant further testified that he also gave counsel information regarding individuals involved in unlawful activity in the hopes of getting a reduction based on cooperation. The movant explained that these unidentified individuals were, in fact, later arrested by the same agents who arrested him. He claims these witnesses then blamed the movant for their legal troubles.

Regarding his ability to speak and understand English, the movant acknowledged that during his trial he had occasion to personally address the court, but claims he did so in "broken" English. The movant conceded, however, that he was in the United States, for the most part, since he was 8 years old, and while he understood some of what was being said in English during trial, he found it hard to understand everything. When asked repeatedly why he did not ask the court during one of his allocutions for the appointment of an interpreter, the movant's responses were evasive, and nonresponsive.[6] For example, when questioned regarding whether he spoke English while in state prison, the movant responded that there "is segregation" and Haitians "tend to gravitate towards Haitians."

The movant further testified that it was his attorney who decided to take his case to trial. The movant claims that from the

---

[6]Independent review of the record reveals that the movant's testimony in this regard is highly disingenuous. Nowhere in the record does it suggest that the movant spoke in "broken" English. To the contrary, the movant was eloquent and was able to understand the court's questions and respond appropriately. (See e.g., T.116-117).

beginning he did not want to go to trial, but had "no other choice." When asked during cross-examination if he intended to plead guilty, why was it essential for counsel to have interviewed and/or called all of the witnesses the movant purportedly had that would exculpate him, the movant's response thereto was evasive. He explained that he wanted counsel to "investigate," and "make an effort" to talk to these witnesses. According to the movant, had counsel done as instructed, it would have enabled the movant to be in a better position to determine whether to accept a plea or go to trial. Regardless, the movant continually repeated that had he been aware of his potential sentence exposure, he would have pled to the indictment and possibly obtained a lesser sentence based on acceptance of responsibility.

After careful consideration of the testimony of the movant in the context of this case and close observation of his demeanor, as well as careful attention to and review of the testimony of defense counsel at the evidentiary hearing, and, taking into account the respective interests of the parties in the outcome of this proceeding, the undersigned finds credible Attorney Rocha's testimony that he advised the movant on more than one occasion of the benefits of pleading guilty versus proceeding to trial. This court also credits counsel's testimony that he cautioned the movant that whether he pleaded guilty or proceeded trial, the movant faced at a minimum between 22 to 30 years in prison and up to a maximum of life in prison. This court further finds credible counsel's testimony that after explaining the options to the movant, the movant insisted on proceeding to trial, despite counsel's recommendation to the contrary. The undersigned is persuaded that counsel properly advised the movant about his sentencing exposure if convicted at trial and his numerous potential exposures if he pleaded guilty to the indictment.

Finally, the court finds that the movant knew the benefits of pleading guilty and understood that if he proceeded to trial and was convicted, he faced a severe term of imprisonment, including the potential for life. The court is not persuaded and finds disingenuous the movant's testimony that he never had any discussions with counsel, and that it was counsel who insisted on taking the case to trial. The undersigned further finds the movant's testimony equivocal and disingenuous, and rejects the movant's self-serving declaration that had he been properly advised, he would have pleaded guilty and not proceeded to trial.

Thus, the undersigned finds the movant has failed to make a showing in this collateral proceeding that he was misadvised or prevented from pleading guilty as charged. Consequently, the movant has failed to establish a *prima facie* case as to Strickland's first prong, that counsel's performance was constitutionally deficient. The evidence showed that the movant was properly counseled, more than adequately under Sixth Amendment standards, regarding the benefits to be had by pleading guilty versus the risks associated with proceeding to trial. In short, the movant has not carried his burden of showing that counsel's performance was deficient. Brady, 397 U.S. at 756.

Even if we were to assume, without deciding, that counsel was deficient in this regard, the movant would also have to establish that he was prejudiced by counsel's misadvice. A significant sentencing disparity in combination with defendant's statement of his intention to accept a plea is sufficient to support a prejudice finding regarding a misadvice of plea by counsel. See Pham v. United States, 317 F.3d 178, 182 (2nd Cir. 2003)(citing United

States v. Gordon, 156 F.3d 376, 380 (2nd Cir. 1998).

     This court finds counsel's testimony forthright and credible
that the movant refused to accept any term of imprisonment over six
years. Additionally, movant's declaration that he intended from the
outset to plead guilty is disingenuous and thereby rejected. The
court finds the movant's testimony in this regard highly suspect,
given the movant's insistence that counsel interview potential
exculpatory witnesses. Thus, the undersigned finds the movant's
after the fact testimony concerning his desire to plead guilty,
without any objective evidence in support thereof, insufficient to
establish that he was prejudiced by counsel's alleged advice. See
Diaz, 930 F.2d at 835 ("[A]fter the fact testimony concerning [the]
desire to plead, without more, is insufficient to establish that
but for counsel's alleged advice or inaction, [the defendant] would
have accepted the plea offer."). See also Doe v. United States,
2010 WL 1737606, *6-7 (S.D.Ga.2010); Scott v. United States, 325
Fed.Appx. 822, 825, 2009 WL 1143179, *2 (11 Cir. 2009). In
conclusion, the petitioner has failed to demonstrate either
deficient performance or prejudice pursuant to Strickland, and is
therefore entitled to no relief on this claim.

     B.  Failure to Investigate and/or Call Defense Witnesses

     In **claim two**, the movant asserts that his lawyer rendered
ineffective assistance of counsel when counsel failed to interview,
prepare, and/or otherwise call defense witnesses to testify at
trial. (Cv-DE#1:6; Cv-DE#2:27).

     Effective assistance of counsel embraces adequate pretrial
investigation. See Strickland v. Washington, 466 U.S. 668, 691
(1984). Trial counsel has "a duty to make reasonable investigations

22

or to make a reasonable decision that makes particular investigations unnecessary." <u>Id</u>. Consequently, "[w]hen a lawyer fails to conduct a substantial investigation into any of his client's plausible lines of defense, the lawyer has failed to render effective assistance of counsel." <u>McCoy v. Newsome</u>, 953 F.2d 1252, 1263 (11 Cir. 1992), <u>quoting</u>, <u>House v. Balkcom</u>, 725 F.2d 608, 615, 617-18 (11 Cir.), <u>cert</u>. <u>denied</u>, 469 U.S. 870 (1984).

To determine whether the investigation was reasonable, the court "must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." <u>Wiggins v. Smith</u>, 539 U.S. 510, 523 (2003)(citation and quotation marks omitted). Choosing to forego a particular investigation must be a "reasoned choice." <u>Id</u>. The Supreme Court has reiterated that "[i]n judging the defense's investigation, as in applying Strickland generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made and by giving a 'heavy measure of deference to counsel's judgments.'" <u>Rompilla v. Beard</u>, 545 U.S. 374, 381 (2005) (quoting Strickland, 466 U.S. at 689, 691). <u>See also</u> <u>McCoy v. Newsome</u>, 953 F.2d 1252, 1262-63 (11 Cir. 1992) and cases cited therein.

The movant has provided a sworn declaration[7] wherein he avers

---

[7]The movant here has attached evidence in the form of both affidavits and sworn declarations from multiple witnesses he claims were willing to testify on his behalf. Affidavits are sworn before a notary public or other official, while unsworn declarations are not. In this instance, however, the declarations attached to the movant's supporting memorandum (Cv-DE#2) were declared under penalty of perjury and, thus, may be considered as evidence in support thereof. Under 28 U.S.C. §1746 unsworn declarations which are in writing and which are subscribed by the declarant "as true under penalty of perjury, and dated" can be treated with like force and effect as sworn declarations and affidavits. <u>Tramell Real Estate Corp. v. Trammell</u>, 748 F.2d 1516 (11ᵗʰ Cir. 1984)(Finding that an

that he provided the names of numerous witnesses that were willing to testify on the movant's behalf at trial. The movant also denies distributing crack cocaine, and claims the substance was "freebase cocaine." He also states he asked counsel whether there was a distinction between either type of drug under federal law. According to the movant, counsel responded that whether the substance was "freebase" was of no import to the movant's case.

In support of his allegation that the substance was "freebase" and that the movant was innocent of any wrongdoing, the movant provides an affidavit and/or declarations executed by the following witnesses: Barry Capell,[8] his cousin, Wayland Pierre,[9] his then

---

attached affidavit submitted with a bill of costs was unnecessary when a signed and dated declaration under penalty of perjury was attached since such a declaration ensured the accuracy of the insured costs. See also Commodity Futures Trading Comm'n v. Infinite Trading Group, 2003 WL 21339265 (N.D. Ga. 2003)(relying on declarations in support of a motion for entry of default judgment). Petmed Express Inc. v. MedPets.com, Inc., 336 F.Supp.2d at 1213, 1217, n. 1 (S.D. Fla. 2004).

[8]Capell's declaration states he never personally bought drugs from either the movant or his coconspirator Eugene on July 28, 2004. Rather, he maintains on that date he was accompanied by Mills and went to Eugene's residence to drop off a female prostitute. According to Capell, the unidentified prostitute paid $10.00 for gas to drive her there. He further states that they had heroine and crack cocaine with them before they arrived at Eugene's residence.

After they were stopped by police, they were instructed to purchase drugs from the movant or Eugene. Both he and Mills would receive money from the officers for their services. However, Capell planned to take the money and buy the drugs wherever he could earlier, and then have Mills hide the money in her bra or panties. He denies, however, going to Eugene's residence to buy drugs from the movant or Eugene. Capell also states that when he was asked to testify at trial, he "couldn't lie on Eugene nor Jules, so I [witness] got missing." He further denied introducing Mills to either the movant or Eugene so that either one could sell Mills drugs.

[9]Pierre states that he purchased a cell phone with the number 754-234-3182, which he gave to his girlfriend as a gift. Pierre avers that the phone was stolen numerous times, and at one point the line would be "cut off" until the phone was "returned." He claims every time the phone was taken and then returned, others would "hike on to the number and steal it." He maintains he never gave the movant nor Eugene a phone, and denies working for either one.

girlfriend, Sandy Monestine,[10] Kimberly Maine,[11] and his coconspirator, Eugene Steven.[12] (Cv-DE#2). These documents however do not alter the outcome of the proceedings.[13] The affidavits submitted post-trial claiming to exculpate the movant are highly suspect and thereby rejected. Moreover, it is arguable that calling these witnesses may have been more damaging and inculpatory regarding the nature and extent of the movant's involvement, so

---

[10]Monestine claims in 2003, she was in her apartment when police "raided" her house looking for the movant. At that time, she was told that the police and INS agents were looking for him because he was selling drugs out of her house, and was also a deportable alien. She claims no drugs were found during this search, and suggests officers lied when they said they found residue of drugs on her counter. She also maintains officers searched her car and took $2,300 in cash from the glove compartment, and later lied saying that the money was found on the movant. She claims the money did not belong to the movant, and although no drugs were at the residence, the movant was arrested and charged with possession of cocaine. She also states the movant was there that day merely visiting with their daughter.

[11]Kimberly Maine's declaration also states that she has never observed the movant sell or give Mills any drugs. She also states that the movant never had an agreement with her regarding the resale of any drugs. According to Maine, in July she and her girlfriend Jen rented a room from Mills, paying her $300.00 in June, and another $300.00 in August. Maine recalls being contacted by the movant who advised that she was being implicated in the offense because she had introduced Mills to the movant. Maine states that Mills and Capell would accompany her to her ex-lover's house, at which time they both advised Maine that agents were paying them $500 each to buy cocaine from Euguene's residence. She claims Mills and Capell were driving to Miami every day to buy cocaine and heroin. Both would then go to Eugene's residence, where they would act like they had purchased the drugs there. Then, they would leave the money from they received from the agents, make senseless talk, mix a gram of cocaine with Benzocaine, and then take it to the agents, returning later to retrieve their money.

[12]Steven's affidavit states that he never came to an agreement to commit a conspiracy of any kind, and denies knowing the movant prior to their arrest. He claims they were both falsely accused by persons already in trouble with the law that were looking for a reduction in their sentences. Eugene also explains that due to his separation from his wife, she rented a residence for him so that he could have a place to visit and stay with his children.

[13]Post-trial, self-serving affidavits, such as the ones relied upon by the movant in this case are viewed with extreme suspicion. See Drew v. Scott, 28 F.3d 460, 462-63 (5 Cir.), cert. denied, 512 U.S. 1266 (1994). See also May v. Collins, 955 F.2d 299, 314 (5 Cir. 1992) and cases cited therein, cert. denied, 504 U.S. 901 (1992)(when faced with recanting affidavits, trial court may make credibility choice in favor of trial testimony without taking additional live testimony).

that counsel's strategic decision not to call these witnesses should not be second-guessed here.

Moreover, at the evidentiary hearing, movant's trial counsel, Attorney Rocha, testified that the only witness the movant wanted him to contact was the mother of his child, Sandy Monestine. Counsel testified that he did, in fact, speak with Monestine, but she had no information to offer that would have been useful to the movant at trial. Counsel remembered specifically going over the discovery and the dates when the incidents allegedly took place. When asked if she could place the movant somewhere else during those relevant times, Monestine advised him that she could not. After speaking with Monestine, counsel strategically determined not to call Monestine as a defense witness because she had no valuable information which would be helpful to the defense. However, counsel did recall contacting her to testify as a character witness at movant's sentencing.

Counsel also recalled the movant advising him that his coconspirator Eugene was "very slow," and would possibly testify on the movant's behalf. Counsel explained to the movant that calling Eugene might hurt, rather than assist the defense. Additionally, he also advised the movant that Eugene's counsel might not permit his client to testify.

The movant[14] testified, however, that he provided counsel with the names and contact numbers for each of the foregoing witnesses,

---

[14]The movant's sister, Martadarleen Allwood, testified at the hearing that counsel never conferred with her or the movant's other siblings regarding the brother's defense or how the case was progressing. She claims that after the movant was convicted, she learned her brother had witnessed he had wanted to have called to testify at trial. She did not attempt to contact these witnesses, and claims one of her other siblings, her brother or sister, may have done so.

and pleaded with him to contact them, but counsel never did so. Apparently, with regard to calling Pierre, the movant states counsel advised him against calling Pierre because this would result in Pierre being charged, as well.

First, regarding counsel's advice as to Eugene, assuming Eugene had testified as proffered, this testimony would have been subject to intense cross-examination which may have resulted in testimony that would have been more inculpatory, rather than exculpatory. Moreover, in all likelihood the witness would have invoked his Fifth Amendment right against self-incrimination. Regarding Monestine's testimony, counsel interviewed this witness and determined there was nothing beneficial to be had from calling her to testify. Consequently, counsel's strategic decision in this regard should not be second-guessed here. Counsel, however, was forthright that no other witnesses were provided to him by the movant.

After carefully considering the testimony adduced at the evidentiary hearing, this court credits counsel's testimony that he investigated whether or not to call Monestine and Eugene as witnesses. The court further credits counsel's testimony that no other potential witnesses were provided to him by the movant. This Court finds that counsel's strategic decision as to Monestine and Eugene was not unreasonable, especially since these two witnesses may have provided more incriminating than exculpating testimony. Furthermore, the movant has not established that even if these two witnesses had been called, that they would have testified as proffered in their declarations. Regarding the remaining witnesses, this court finds that no deficient performance or prejudice has been established, especially where counsel was unaware of the

27

existence of these witnesses.

Even if this Court were to assume, without deciding, that counsel was deficient in that he failed to investigate and call all of the foregoing defense witnesses, then the Court must determine whether the movant suffered prejudice under Strickland. In order to establish prejudice, the court must determine whether, but for counsel's unprofessional error, the outcome of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). For the court to focus merely on "outcome determination," however, is insufficient; "[t]o set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993). The movant, therefore, must establish "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Lockhart, 506 U.S. at 369 (quoting Strickland, 466 U.S. at 687). A court must "judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (quoting Strickland, 466 U.S. at 690). This judicial scrutiny is "highly deferential." Id.

In this case, the court finds that the movant cannot establish prejudice, because even if the witnesses had testified as proffered, this Court does not find their proffered testimonies credible. To the contrary, many of these witnesses would have been subjected to cross-examination regarding their criminal history background, their drug usage, their relationship to the movant, and their motive for fabricating exculpatory testimony on his behalf. If counsel had called these witness to testify and the jury had

disbelieved their testimony, the jury could have inferred that the movant was in fact guilty.

Regardless, the witnesses' testimony would ultimately not have resulted in the movant's acquittal at trial. Given the facts adduced at trial, as summarized previously in this Report, no showing has been made in this collateral proceeding that the outcome of the guilt phase portion of the trial would have been different. It is evident from full review of the record that trial counsel did properly investigate the facts of the case and had investigated all possible defenses. Although the defense presented was unsuccessful, that does not in and of itself indicate that counsel rendered constitutionally ineffective assistance. Consequently, the movant is entitled to no relief on this claim. See Strickland, supra.

## Remaining Claims

In **claim three,** the movant asserts that he was denied effective assistance of counsel, where his lawyer failed to advise the court that the movant was in possession of the equivalent of powder cocaine, not crack cocaine, in order to ensure that his guideline sentence was properly computed. (Cv-DE#1:8; Cv-DE#31). The movant has claimed throughout this proceeding that the substance he possessed was freebase, not crack cocaine.

This conclusory allegation, however, is bereft of any objective evidence, and is thus subject to summary dismissal. Machibroda v. United States, 368 U.S. 487 (1962).

Moreover, any such challenge would have been unsuccessful. At trial, Matthew Mulligan, a forensic chemist with the Drug

29

Enforcement Administration ("DEA"), testified that he tested each of the government's drug exhibits in this case and found them to be cocaine base, or what is commonly referred to as crack cocaine. (Cr-DE#157:1849,1853-72,1897,1906). It should be noted that Mulligan is also the same chemist who prepared the DEA drug reports, testing the drugs seized and determining that the substance involved was crack cocaine. (Cv-DE#2-Exhibit). Review of these documents further reveals that the items seized appeared to be pieces of "crack cocaine," off-white in color. (Id.). As will also be recalled, the cooperating CI Mills, Detective Jensen, and Detective Rohloff all confirmed that the substance involved in the offenses was crack cocaine. (Cr-DE#153:722,746,764-66,777-851,901-02; Cr-DE#155:1120-1182; Cr-DE#156:1400-1411).

The movant did not then nor does he now provide any proof that the substance was not crack cocaine, or that he thought he was charged with some form of cocaine base other than crack cocaine. See United States v. Stephenson, 557 F.3d 449, 452-453 (7th Cir. 2009)(crack is but one form of cocaine base, in determining whether a substance is crack the court generally relies on whether it was considered to be crack by "experts," those who use, buy, or sell it)(citations and footnote omitted); United States v. Dunbar, 553 F.3d 48, 63-65 (1st Cir. 2009)(discussing the difference between crack and other forms of cocaine base, finding ample evidence in that case to link defendant to crack, finding "no reason to believe that the defendant was involved in the distribution of any form of cocaine base (such as freebase or the paste form sometimes smoked in the Andes) other than crack cocaine.")(citations and footnotes omitted).

Consequently, the movant can neither establish deficient performance nor prejudice under Strickland arising from counsel's

failure to advise the court at trial or at sentencing that the substance involved was anything other than crack cocaine. Assuming, without deciding, that counsel had raised the issue at sentencing, given the evidence adduced at trial, no showing has been made in this collateral proceeding that such an argument would have succeeded. In other words, the movant cannot establish that the court would have determined his initial base offense level on anything other than crack cocaine. See Berry v. United States, 2008 WL 2447154 at *2 (11th Cir. 2008)(unpublished)(counsel not ineffective when evidence adduced at trial shows that any challenge to government's characterization of cocaine as crack would have failed).

In **claim four**, the movant asserts that the cumulative error by counsel warrant vacatur of his convictions. For the reasons stated in this Report, the movant is not entitled to vacatur on any of the claims presented. When viewing the evidence in this case in its entirety, the alleged errors, neither individually nor cumulatively, infused the trial with unfairness as to deny movant a fundamentally fair trial and due process of law. The movant is not entitled to habeas corpus relief on any of the claims presented. See Fuller v. Roe, 182 F.3d 699, 704 (9 Cir. 1999)(holding in federal habeas corpus proceeding that where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation), overruled on other grounds, Slack v. McDaniel, 529 U.S. 473, 482 (2000). See also United States v. Rivera, 900 F.2d 1462, 1470 (10 Cir. 1990)(stating that "a cumulative-error analysis aggregates only actual errors to determine their cumulative effect.") .

## Conclusion

It is therefore recommended that this motion to vacate be denied.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

Signed this 27th day of September, 2010.

_____
UNITED STATES MAGISTRATE JUDGE

cc:  Arthur Wallace, Esq.
     Attorney for Movant
     2401 E. Atlantic Blvd.
     Suite 4000
     Pompano Beach, FL 33062-5243
     Phone: 954-943-2020
     Fax: 954-782-1552

     Scott H. Behnke, AUSA
     United States Attorney's Office
     500 E. Broward Boulevard
     Suite 700
     Ft. Lauderdale, FL 33301-002
     Phone: 954/356-7255
     Fax: 954/356-7336